EILEEN R. RIDLEY, CA Bar No. 151735
  eridley@foley.com
ALAN R. OUELLETTE, CA Bar No. 272745
  aouellette@foley.com
**FOLEY & LARDNER LLP**
555 CALIFORNIA STREET, SUITE 1700
SAN FRANCISCO, CA 94104-1520
TEL: 415.434.4484  FAX: 415.434.4507

KATHRYN A. SHOEMAKER, CA Bar No. 305111
  kshoemaker@foley.com
**FOLEY & LARDNER LLP**
555 SOUTH FLOWER STREET, SUITE 3500
LOS ANGELES, CA 90071-2411
TEL: 213.972.4500  FAX: 213.486.0065

AMY WHELAN, CA Bar No. 215675
  awhelan@nclrights.org
ASAF ORR, CA Bar No. 261650
  aorr@nclrights.org
**NATIONAL CENTER FOR LESBIAN RIGHTS**
870 MARKET STREET, SUITE 370
SAN FRANCISCO, CA 94102
TEL: 415.365.1338

ALISON PENNINGTON, CA Bar No. 231861
  alison@transgenderlawcenter.org
ILONA TURNER, CA Bar No. 256219
  ilona@transgenderlawcenter.org
**TRANSGENDER LAW CENTER**
1629 TELEGRAPH AVENUE, SUITE 400
OAKLAND, CA 94612
TEL: 415.865.0176

Attorneys for Plaintiffs KATHARINE PRESCOTT,
an individual, and KATHARINE PRESCOTT, on
behalf of KYLER PRESCOTT, a deceased minor

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

KATHARINE PRESCOTT, AN
INDIVIDUAL, AND KATHARINE
PRESCOTT, ON BEHALF OF
KYLER PRESCOTT, A
DECEASED MINOR,

          Plaintiffs,

    v.

RADY CHILDREN'S
HOSPITAL–SAN DIEGO,

        Defendant.

Case No.  '16 CV 2408 BTM JMA

**COMPLAINT FOR:**

1. **VIOLATION OF AFFORDABLE CARE ACT § 1557, 42 U.S.C. § 18116 (DISCRIMINATION BASED ON SEX)**
2. **VIOLATION OF CALIFORNIA'S UNRUH CIVIL RIGHTS ACT, CIVIL CODE § 51 *ET SEQ*. (DISCRIMINATION BASED ON SEX)**
3. **VIOLATION OF CALIFORNIA'S UNRUH CIVIL RIGHTS ACT, CIVIL CODE § 51 *ET SEQ*. (DISCRIMINATION BASED ON DISABILITY)**
4. **VIOLATION OF CALIFORNIA GOVERNMENT CODE § 11135 (DISCRIMINATION BASED ON SEX)**

COMPLAINT

)   **5. VIOLATION OF CALIFORNIA**
)   **GOVERNMENT CODE § 11135**
)   **(DISCRIMINATION BASED ON**
)   **DISABILITY)**
)   **6. VIOLATION OF CALIFORNIA**
)   **BUSINESS & PROFESSIONS CODE**
)   **§ 17200** *ET SEQ.*
)   **7. VIOLATION OF CALIFORNIA**
)   **BUSINESS & PROFESSIONS CODE**
)   **§ 17500** *ET SEQ.*
)
)   **DEMAND FOR JURY TRIAL**
)
)

Plaintiff  KATHARINE PRESCOTT ("Katharine"), an individual, and on behalf of KYLER PRESCOTT ("Kyler"), a deceased minor, by and through her attorneys, hereby alleges as follows against Defendant RADY CHILDREN'S HOSPITAL–SAN DIEGO ("Defendant" or "RCHSD"):

## INTRODUCTION

1.      Kyler Prescott was a 14-year-old transgender boy who was admitted to RCHSD on April 5, 2015, on a 72-hour hold due to his suicidal ideation related to gender dysphoria.  Upon admission, RCHSD staff assured Kyler and his mother Katharine that while at RCHSD, Kyler would be treated as a boy.  RCHSD staff, however, failed to do so.  RCHSD ultimately discharged Kyler early from the 72-hour hold due to Kyler's increasingly severe distress related to the discrimination he faced from RCHSD.  Kyler subsequently died by suicide.

2.      This is an action to secure relief for violations of rights guaranteed by the Patient Protection and Affordable Care Act (the "ACA"), 42 U.S.C. § 18116 ("Section 1557"), California Civil Code § 51 *et seq.*, also known as the Unruh Civil Rights Act (the "Unruh Act"), California Government Code § 11135 ("Section 11135"), California Business & Professions Code § 17200, also known as the California Unfair Competition Law ("Section 17200"), and California Business & Professions Code § 17500 ("Section 17500").

3.      Section 1557 of the ACA prohibits discrimination based on sex by health

care providers that receive federal financial assistance.  42 U.S.C. § 18116 (a); 20 U.S.C. § 1681(a).  The Unruh Act prohibits discrimination in public accommodations in the State of California on the basis of sex (which expressly includes gender identity) and disability.  Cal. Civ. Code §§ 51(b), (e)(1), (e)(5).

4.      Both statutes prohibit health care programs from discriminating against a patient based on the patient's sex, which includes gender identity.  Kyler experienced severe emotional distress and other damages after he was discriminated against on the basis of his sex and/or his disability while he was a patient at RCHSD.

5.      Section 11135 of the California Government Code also prohibits discrimination on the basis of sex (which expressly includes gender identity) by government agencies or any entity that receives funding from the state of California.  *See* Cal. Gov't Code §§ 11135, 12926(r)(2).  RCHSD's actions and omissions also constitute discrimination on the basis of sex, gender identity, and/or disability within the meaning of Section 11135 of the California Government Code.

6.      Section 17200 of the California Business & Professions Code prohibits any "unlawful, unfair, or fraudulent business act or practice" as well as any "unfair, deceptive, untrue or misleading advertising."  Cal. Bus. & Prof. Code § 17200.

7.      Section 17500 of the California Business & Professions Code prohibits, among other things, a business from making or disseminating any statement concerning professional services that is untrue or misleading and is either known or should be known to be untrue or misleading.  Cal. Bus. & Prof. Code § 17500.

8.      Despite RCHSD's representations that it had experience with transgender youth, RCHSD discriminated against Kyler, resulting in his inability to access necessary services and treatment during a dire medical crisis.  These actions amount to discrimination within the meanings of Section 1557 of the ACA, the Unruh Act, and California Government Code Section 11135.

9.      RCHSD's discriminatory conduct toward and treatment of Kyler also constitute unlawful and/or unfair business practices within the meaning of California

-3-                                                    COMPLAINT

Business & Professions Code Section 17200.

10.     Additionally, RCHSD's representations, via the Internet and by personal communication to Katharine, that it had experience with transgender youth, constitute untrue or misleading advertising within the meanings of California Business & Professions Code Sections 17200 and 17500.

11.     Katharine brings this action as an individual and on Kyler's behalf to recover damages for the harms done to her and her deceased son, and for injunctive relief so that in the future RCHSD will provide appropriate, nondiscriminatory care to all of its patients, regardless of sex, gender identity, and/or disability.

12.     Unless enjoined, Defendant will continue to engage in the unlawful acts and practices of discrimination complained of herein.  Plaintiffs have no adequate remedy at law.  Accordingly, Plaintiffs are entitled to injunctive relief.

13.     An actual controversy has arisen and now exists between the parties concerning their respective rights, duties, and obligations under federal and state law.

## JURISDICTION AND VENUE

14.     This Court has original jurisdiction over Plaintiffs' claims arising under the ACA, 42 U.S.C. § 18116, pursuant to 28 U.S.C. § 1331.

15.     Plaintiffs' state law claims are so related to those under which this Court has original jurisdiction that they form part of the same case and controversy.  Supplemental jurisdiction is therefore appropriate over Plaintiffs' remaining claims pursuant to 28 U.S.C. § 1367.

16.     This Court has jurisdiction over Plaintiffs' claims for declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, as well as Federal Rule of Civil Procedure 65.

17.     Venue is proper in this Court pursuant to 29 U.S.C. § 1391(b), because the events giving rise to the claims made herein occurred in this Judicial District, and Defendant RCHSD has its principal place of business within this District.

COMPLAINT

## THE PARTIES

18.     Kyler Prescott, as represented by his mother Katharine Prescott, is a deceased minor and was at all times mentioned herein a resident of the County of San Diego, California.

19.     Katharine Prescott, as Kyler's mother, has a special interest in this matter that is concrete and therefore has standing to bring this claim as a survivorship action.

20.     Defendant RCHSD is now, and was at all times mentioned herein, a nonprofit healthcare organization affiliated with the University of California, San Diego School of Medicine, with its principal place of business located at 3020 Children's Way, San Diego, CA 92123.  RCHSD is a business establishment that offers to the public accommodations, advantages, facilities, privileges, and services.

21.     RCHSD runs its Child and Adolescent Psychiatry Services ("CAPS") program as an inpatient unit for children who need psychiatric treatment.

22.     RCHSD receives federal and state financial assistance such as credits, subsidies, or contracts of insurance within the meanings of Section 1557 of the ACA and Section 11135 of the California Government Code.  42 U.S.C. § 18116(a); Cal. Gov't Code § 11135.  According to the Department of Health and Human Services, RCHSD received $5 million in federal funds in 2015 and nearly $2.2 million in federal funds in 2016.[1]  According to RCHSD's most recent Department of Pediatrics annual report, 48.9% of RCHSD's insurance payments in 2011–2013 stemmed from Medi-Cal plans from the State of California.[2]  RCHSD's 2013 federal tax Form 990 indicates that RCHSD received $98.4 million in local, state, or federal government funding sources. Additionally, RCHSD's 2014 California Office of Statewide Health Planning and Development ("OSHPD") annual disclosure report states that RCHSD received $7.3

---

[1] *Recipient Search*, TAGGS.HHS.GOV, https://taggs.hhs.gov/SearchRecip (under "Enter a Keyword," search for "Rady Children's Hospital – San Diego," then under "Fiscal Year (FY)," select either "2016" or "2015" to view sum of awards to RCHSD for each fiscal year) (last visited Sept. 25, 2016).

[2] RADY CHILDREN'S HOSP. – SAN DIEGO, DEPT. OF PEDIATRICS BIENNIAL REPORT 2011–2013 6, *available at* http://www.rchsd.org/documents/2014/04/dept-of-pediatrics-report-2011-13.pdf (last visited Sept. 25, 2016).

COMPLAINT

million in government contract revenues.[3]

23.     At all relevant times, RCHSD employed the services of doctors, nurses, other professional and non-professional health care providers, and staff, including the nurses, other health care providers, and staff who interacted with Kyler in April 2015. RCHSD advertised its expertise in treating transgender and gender nonconforming children and adolescents through its Gender Management Clinic, from which Kyler had previously received care.  RCHSD held itself out and warranted itself to the public as competent, careful, and experienced in the care and treatment of patients, particularly transgender patients and those with gender dysphoria.  RCHSD's website states that transgender youth "deserve to have a medical home at Rady Children's Hospital–San Diego."[4]

## GENDER IDENTITY AND GENDER DYSPHORIA IN CHILDREN

24.     Gender identity is a person's deeply felt understanding of their own gender. People generally become aware of their gender identity as early as two or three years of age.  Most people's gender identity aligns with the gender designated on their birth certificate (a determination generally based solely on the appearance of a baby's external genitalia at birth).  Some children and adolescents, however, manifest persistent signs that the gender they were assumed to be at birth does not align with their gender identity, or their sense of themselves as a boy or a girl.  For example, a transgender boy is a child who was assumed to be female at birth but who identifies as a boy.  A transgender girl is a child who was assumed to be a boy at birth but identifies as a girl.

25.     For a transgender child, the incongruity between the child's anatomy and gender identity commonly leads to psychological distress characterized by severe and unremitting feelings of sadness, anxiety, and/or frustration.  This distress is a serious

---

[3] OSHPD SIERA Financial Disclosure Reports, https://siera.oshpd.ca.gov/FinancialDisclosure.aspx (select report type "Hospital Annual," set "From Year" and "To Year" to 2014, and search for "Rady Children's Hospital – San Diego (106370673)," then, under "Audited," select the "Detail" PDF link.

[4] RADY CHILDREN'S HOSP., *Gender Management Clinic*, http://www.rchsd.org/programs-services/endocrinology-diabetes/services/gender-management-clinic/ (last visited Sept. 25, 2016).

COMPLAINT

condition recognized by medical professionals as gender dysphoria.

26.     The Diagnostic and Statistical Manual of Mental Disorders (DSM-5) defines gender dysphoria as a marked difference between a person's gender identity and their assumed gender at birth, which persists for at least six months and manifests itself in at least two other symptoms (*e.g.*, "a desire to prevent the development of the anticipated secondary sex characteristics," "a strong desire to be of the other gender," and/or "a strong desire to be treated as the other gender").  American Psychiatric Association, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 452 (5th ed. 2013). Gender dysphoria is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning.  *Id.* at 453.  If left untreated, this clinical distress can lead to debilitating depression and diminishment of self-esteem as well as serious incidents of self-harm, suicide attempts, and suicide.

27.     Transgender children represent a small but naturally occurring variation of human diversity.  Diane Ehrensaft, *From Gender Identity Disorder to Gender Identity Creativity: True Gender Self Child Therapy*, 51 J. OF HOMOSEXUALITY 337, 338-39 (2012); Norman Spack et al., *Children and Adolescents with Gender Identity Disorder Referred to a Pediatric Medical Center*, 129 PEDIATRICS 418, 421 (2012).

28.     Medical evidence and clinical practice demonstrate that family and societal rejection or disregard of a child's gender identity, as well as attempts to change a child's gender identity, are harmful to transgender children.

29.     Kyler was assumed to be female at birth.  However, as early as age 10, Kyler began exhibiting signs that he was a boy, not a girl.  His clothing choices became more stereotypically masculine and he expressed a desire to become more muscular.  He also began to socialize almost exclusively with other boys.  When he was twelve, due to increasing gender dysphoria, Kyler began engaging in self-harming behaviors.

30.     When Kyler was thirteen, he told his mother Katharine that he was boy.  At this point, Kyler cut his hair short and began to come out to other family members and close friends as a boy.  As he entered puberty, Kyler's distress due to his gender

COMPLAINT

dysphoria significantly worsened.  Kyler became acutely depressed and began engaging in severe self-harming behaviors.  Kyler's parents became increasingly concerned about his mental health, and Kyler's then-therapist focused their therapy sessions on helping him cope with his gender dysphoria and depression.

31.    Many transgender children and their families work with mental health providers.  Besides evaluating children for and diagnosing children with gender dysphoria, mental health providers create a space where a child is able to develop a better understanding of their gender identity, alleviate the psychological distress associated with gender dysphoria, and explore treatment options for addressing the child's gender dysphoria.

32.    Health care providers recognize that when a child is experiencing significant and prolonged distress associated with gender dysphoria, transition is the only known and effective treatment that improves a child's mental health and reduces the risk that the child will engage in self-harming behaviors.  Transition is the process by which a person brings their outer appearance and identity into closer alignment with their gender identity, or affirmed gender.  Social transition specifically refers to steps of a transition that do not involve medication or surgical intervention, and can include changing one's name and pronouns, and wearing clothes that match the person's affirmed gender.

33.    To alleviate what might otherwise be incapacitating distress and give a young person the opportunity to develop a strong, positive sense of self, health care providers can prescribe medications that delay the puberty of children with gender dysphoria.  Those medications signal to a person's body not to produce pubertal hormones (*i.e.*, testosterone or estrogen).  As a result, those medications prevent a transgender boy from developing breasts, feminine facial features, and beginning menstruation, among other unwanted secondary sex characteristics and effects of puberty.  With puberty-delaying medication acting as a "pause button," that child has the opportunity to live life consistent with their gender identity without the distress of permanent, unwanted physical characteristics of their assumed gender at birth.  During

COMPLAINT

this time, the young person will work with their family and health care providers to develop a tailored treatment plan to address the child's gender dysphoria.

34.     At the age of thirteen, Kyler, with the support of his parents, socially transitioned to living life as a boy.  By the time he was fourteen, Kyler began seeing a new therapist, Darlene Tando, who has expertise in providing therapy to transgender youth.  Starting in July 2014, Darlene Tando met with Kyler every two weeks.  She also held joint sessions with Kyler and his family members to assist the family in supporting Kyler's transition.

35.     In September 2014, Kyler's endocrinologist, a physician in the Gender Management Clinic at RCHSD, approved him for puberty-delaying medication, and in October 2014, Kyler received his first such treatment.  Kyler was thrilled with the medication because it stopped him from menstruating, which had been causing him extreme distress.

36.     Despite the positive effect his transition had on his overall mental health, Kyler still experienced depression and gender dysphoria and occasionally engaged in self-harming behaviors.  This was compounded by the fact that Kyler was also bullied and harassed about his gender identity by his peers and teachers.

37.     Once a transgender person with gender dysphoria transitions, being referred to with the wrong gender pronoun or honorific is often incredibly distressing.  Such misgendering is frequently understood by a transgender person as a rejection or denial of the person's identity and can significantly exacerbate gender dysphoria.  Children and adolescents, especially those with gender dysphoria, are often highly sensitive to misgendering.

38.     For Kyler, being misgendered—being called "she" instead of "he"—was a huge source of psychological distress.  In fact, Kyler withdrew from classroom learning at the charter school he attended to participate in a private independent study because some of his teachers continuously misgendered him, causing him such distress that he was unable to function in school.

COMPLAINT

## **DEFENDANT'S WRONGFUL CONDUCT**

39.     Late in the day on April 5, 2015, Katharine took Kyler to be seen at the Sam S. and Rose Stein Emergency Care Center of RCHSD for suicidal ideation related to his gender dysphoria and to treat serious self-inflicted lacerations.  He was then admitted to RCHSD's Child and Adolescent Psychiatry Services ("CAPS") unit in the early morning of April 6, 2015, on a Cal. Welf. & Inst. Code Section 5150 hold for psychiatric inpatient care.

40.     At this time, Kyler had received a legal name and gender change, which was reflected in his medical records.  In addition, upon Kyler's intake at CAPS, RCHSD and CAPS staff were made aware by Katharine of Kyler's male sex gender identity and his need to be referred to exclusively with male gender pronouns.  In fact, his male gender identity was denoted on the medical wrist bracelet RCHSD provided him.

41.     Upon Kyler's intake at CAPS, RCHSD staff informed Katharine that Kyler's sex and gender identity would be respected and affirmed; in other words, RCHSD staff assured Katharine that all staff would refer to Kyler with male gender pronouns and would otherwise treat him as a boy.

42.     Upon his admission and throughout his stay, RCHSD knew that Kyler was a transgender boy in acute psychological distress.

43.     Despite RCHSD and CAPS staff's knowledge of his need to be referred to with masculine pronouns, of his diagnosis of gender dysphoria, and of his then-current acute psychological state, nursing and other RCHSD staff repeatedly addressed and referred to Kyler as a girl, using feminine pronouns.  RCHSD staff repeatedly misgendered Kyler and actively denied and ignored his sex, including his gender identity.

44.     Kyler complained to Katharine repeatedly during his stay at RCHSD that RCHSD and CAPS staff were referring to him with feminine pronouns, which was causing him extreme distress.  Kyler also reported to Katharine that the other children who were patients on his floor had initially referred to him as "he," correctly recognizing him as male, but subsequently, as a result of RCHSD staff's misgendering Kyler, had

COMPLAINT

begun to call Kyler "she," causing him great embarrassment and distress.  After Kyler was discharged, Kyler told Katharine that one RCHSD employee had said to him, "Honey, I would call you 'he,' but you're such a pretty girl."

45.     At admission and during Kyler's stay at RCHSD, Katharine observed staff calling Kyler "she" on several occasions, and she reiterated each time that it was essential to exclusively refer to Kyler with male gender pronouns, and that misgendering caused him serious harm.

46.     During Kyler's stay at RCHSD, Katharine called RCHSD multiple times to share Kyler's reports of misgendering and remind RCHSD and CAPS staff of their commitment and obligation to exclusively refer to Kyler with masculine pronouns. Katharine repeatedly told RCHSD and CAPS staff that it was essential that Kyler be referred to with exclusively masculine pronouns.

47.     In response, RCHSD blocked Katharine's phone number, leaving her unable call the CAPS unit, which had control over her son during his time of distress, as well as leaving her unable to solicit updates on Kyler's condition.  Katharine then contacted her son's therapist, who confirmed that RCHSD had blocked Katharine's number from calling the CAPS unit.  As a result of RCHSD's egregious conduct, Kyler suffered severe emotional distress and harm.  Additionally, Katharine was and continues to be traumatized by the experience.

48.     While Kyler was isolated from his mother, RCHSD and CAPS continued to ignore Katharine's requests to respect Kyler's gender identity, which caused him severe emotional distress and harm.

49.     Kyler was severely harmed by RCHSD staff's repeated misgendering, as a result of RCHSD's failure to respect and affirm his male gender and his gender dysphoria.  Kyler's distress was compounded by Katharine's inability to advocate for or console her son as a result of RCHSD's blocking Katharine's phone calls to the CAPS unit.

50.     Given Kyler's worsening condition, Katharine contacted Kyler's therapist,

COMPLAINT

who in turn contacted CAPS, to inform them of Kyler's increasing distress due to the discriminatory actions of RCHSD.

51.     Kyler's medical providers ultimately concluded that despite Kyler's serious continuing depression and suicidal ideation, he should nonetheless be discharged early from the Cal. Welf. & Inst. Section 5150 hold at RCHSD, due to the discrimination he experienced at RCHSD.

52.     Kyler was discharged from Defendant's facility on April 7, 2015, with over 48 hours left on his 72-hour hold.

53.     Following his discharge from RCHSD, Kyler continued to feel shocked, angry, humiliated, anxious, and depressed as a result of the discriminatory treatment he was subjected to at RCHSD.  Kyler later stated that his experience at RCHSD was "horrible."

54.     On May 18, 2015, Kyler died by suicide.

## FIRST CAUSE OF ACTION

### VIOLATION OF AFFORDABLE CARE ACT § 1557, 42 U.S.C. § 18116

### (Discrimination Based on Sex)

55.     Plaintiffs incorporate by reference each and every allegation in the foregoing paragraphs of this Complaint.

56.     The Affordable Care Act ("ACA") includes robust antidiscrimination provisions prohibiting healthcare programs receiving federal assistance from discriminating on the basis of sex.  42 U.S.C. § 18116.

57.     Defendant is a hospital facility that receives federal funding in the form of extensive federal grants for services provided to its patients.  Defendant therefore meets the requirement of being a "health program or activity, any part of which is receiving Federal financial assistance."  42 U.S.C. § 18116(a).

58.     The ACA's ban on sex discrimination includes discrimination against any individual on the basis of sex for the purpose of providing health services.  The ACA provides the following:

COMPLAINT

> [A]n individual shall not, on the ground prohibited under . . .
> title IX of the Education Amendments of 1972 (20 USC 1681 et
> seq.) . . . be excluded from participation in, be denied benefits
> of, or be subjected to discrimination under, any health program
> or activity, any part of which is receiving Federal financial
> assistance, including credits, subsidies, or contracts of
> insurance, or under any program or activity that is administered
> by an Executive Agency or any entity established under this
> title (or amendments).

42 U.S.C. § 18116(a).

59. Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq*., prohibits discrimination based on sex in education programs that receive federal financial assistance.

60. Over the past two decades, federal courts have been nearly unanimous in interpreting federal civil rights laws, including Title IX and Title VII, to prohibit discrimination against transgender people. Federal agencies similarly have interpreted federal civil rights laws to prohibit discrimination or harassment of transgender people. Indeed, the regulations implementing the ACA's nondiscrimination provision mandate that covered entities must "treat individuals consistent with their gender identity . . . ." 45 C.F.R. § 92.206.

61. As a transgender child, Kyler had a right under the ACA to receive health care services free from discrimination based upon sex.

62. Defendant discriminated against Kyler in violation of the ACA by intentionally ignoring his sex, referring to him with the wrong gender pronouns, and by blocking Katharine's phone calls to the hospital. Non-transgender individuals or individuals without a diagnosis of gender dysphoria would not have been subjected to this discrimination or isolation by RCHSD. Kyler has been aggrieved by this violation of the ACA.

COMPLAINT

63.     As a result of Defendant's conduct, Kyler suffered emotional distress and anguish, embarrassment, humiliation, violation of dignity, loss of enjoyment of life, and other compensatory damages.

64.     Plaintiffs seek relief, including declaratory and injunctive relief, as set forth below.

## SECOND CAUSE OF ACTION

### VIOLATION OF CALIFORNIA'S UNRUH CIVIL RIGHTS ACT, CIVIL CODE § 51 *et seq.*

**(Discrimination Based on Sex)**

65.     Plaintiffs incorporate by reference each and every allegation in the foregoing paragraphs of this Complaint.

66.     California Civil Code Section 51(b) *et seq.*, also known as the Unruh Civil Rights Act, provides that all persons in the state are entitled to the "full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever," regardless of sex.  Under California Civil Code Section 51(e)(5), sex is expressly defined to include "a person's gender identity and gender expression."

67.     Kyler was a transgender boy.  As such, he is within a class of persons protected by California Civil Code Section 51(b).

68.     RCHSD is a "business establishment" for the purposes of California Civil Code Section 51.

69.     Kyler sought appropriate medical care, a service RCHSD provides to the public.

70.     RCHSD's conduct denied, aided, incited a denial of, discriminated, or made a distinction that denied full and equal advantages, privileges, and services to Kyler based upon his sex, and therefore constituted a violation of California Civil Code Section 51(b).  Accordingly, Kyler is entitled to recover a civil penalty authorized by California Civil Code Section 52(a).

COMPLAINT

71.     RCHSD staff repeatedly addressed Kyler as female and refused to respect or acknowledge his sex and male gender identity.  As a result, Kyler was forced to leave RCHSD before completing his 72-hour hold and was left without in-patient treatment during a time of crisis.  Kyler suffered significantly increased emotional distress as a direct result of these actions.

72.     RCHSD's staff blocked Katharine's phone calls to RCHSD/CAPS during Kyler's time of distress.  Kyler suffered even more emotional distress as a result of these actions.

73.     As a direct and proximate result of RCHSD's wrongful actions, Kyler has suffered damages, including severe emotional distress and mental anguish all in an amount to be proven at trial but exceeding the minimum jurisdictional limits of this court.

74.     Plaintiffs seek relief, including declaratory and injunctive relief, as set forth below.

## THIRD CAUSE OF ACTION
## VIOLATION OF CALIFORNIA'S UNRUH CIVIL RIGHTS ACT,
## CIVIL CODE § 51 *et seq.*
### (Discrimination Based on Disability)

75.     Plaintiffs incorporate by reference each and every allegation in the foregoing paragraphs of this Complaint.

76.     California Civil Code Section 51(b) *et seq.*, also known as the Unruh Civil Rights Act, provides that "(a)ll persons within the jurisdiction of this state are free and equal, and no matter what their . . . disability . . . are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever."

77.     RCHSD is a "business establishment" within the meaning of Unruh Civil Rights Act Cal. Civ. Code Section 51(b) *et seq.*

78.     Kyler's gender dysphoria constitutes a mental disability that limits a major life activity.  Cal. Gov't Code §§ 12926(j), 12926.1(c).  This disability falls within the

purview of the Unruh Civil Rights Act.  Cal. Civ. Code § 51(e)(1).

79.   Kyler sought appropriate medical care, a service RCHSD provides to the public.

80.   RCHSD's conduct violated the Unruh Civil Rights Act by denying (or aiding or inciting the denial of) Kyler's rights to full and equal use of the accommodations, advantages, facilities, privileges, or services RCHSD offers to patients by denying Kyler adequate care on the basis of his disability.  Accordingly, Kyler is entitled to recover a civil penalty authorized by California Civil Code Section 52(a).

81.   As a direct and proximate result of RCHSD's wrongful actions, Kyler suffered damages, including severe emotional distress and mental anguish, all in an amount to be proven at trial but exceeding the minimum jurisdictional limits of this court.

82.   Plaintiffs seek relief, including declaratory and injunctive relief, as set forth below.

## FOURTH CAUSE OF ACTION

## VIOLATION OF CALIFORNIA GOVERNMENT CODE § 11135

### (Discrimination Based on Sex)

83.   Plaintiffs incorporate by reference each and every allegation in the foregoing paragraphs of this Complaint.

84.   Section 11135(a) of the California Government Code provides in pertinent part that no person in the State of California shall, on the basis of sex, be unlawfully denied full and equal access to the benefits of, or be unlawfully subjected to discrimination under, any program or activity that is funded directly by the state or receives any financial assistance from the state.  Cal. Gov't Code § 11135(a).

85.   The term "sex" expressly includes discrimination based on gender identity and expression.  Cal. Gov't Code §§ 11135(e), 12926(r)(2).

86.   California Government Code Section 11135(f) clarifies that any person who is perceived to have, or is associated with someone who has, any of the characteristics listed under Section 11135 is also protected from discrimination in state-funded

COMPLAINT

programs.

87.    At all times relevant to this action, RCHSD received financial assistance from the State of California.  As such, Defendant is subject to the anti-discrimination provisions of Section 11135.

88.    Defendant's conduct denied Kyler full and equal access to the services, programs, and activities offered by Defendant to patients at RCHSD in violation of Cal. Gov't Code Section 11135.

89.    Defendant's conduct also denied Katharine, who is "associated with" Kyler under the meaning of the statute by virtue of the fact that she is the mother of Kyler, a transgender child, full and equal access to the services, programs, and activities offered by Defendant in violation of Section 11135.

90.    As a direct and proximate result of RCHSD's violation of California Government Code Section 11135, Kyler and Katharine have been injured as set forth herein.

91.    Plaintiffs seek relief, including declaratory and injunctive relief, as set forth below.

### FIFTH CAUSE OF ACTION

### VIOLATION OF CALIFORNIA GOVERNMENT CODE § 11135

### (Discrimination Based on Disability)

92.    Plaintiffs incorporate by reference each and every allegation in the foregoing paragraphs of this Complaint.

93.    Section 11135(a) of the California Government Code provides in pertinent part that no person in the State of California shall, on the basis of disability, be unlawfully denied full and equal access to the benefits of, or be unlawfully subjected to discrimination under, any program or activity that is funded directly by the state or receives any financial assistance from the state.  Cal. Gov't Code § 11135(a).

94.    California Government Code Section 11135(f) clarifies that any person who is perceived to have, or is associated with someone who has, any of the characteristics

COMPLAINT

listed under Section 11135 is also protected from discrimination in state-funded programs.

95.     At all times relevant to this action, Kyler was and is a qualified individual with a disability within the meaning of Section 11135(c)(1) and meets the essential requirements for the receipt of the services, programs, or activities of Defendant.  Cal. Gov't Code §§ 11135; 12926(j).

96.     At all times relevant to this action, RCHSD received financial assistance from the State of California.  As such, Defendant is subject to the anti-discrimination provisions of Section 11135.

97.     Defendant's conduct denied Kyler full and equal access to the services, programs, and activities offered by Defendant to patients at RCHSD in violation of Cal. Gov't Code Section 11135.

98.     Defendant's conduct also denied Katharine, who is "associated with" Kyler under the meaning of the statute by virtue of the fact that she is the mother of Kyler, a qualified individual with a disability within the meaning of Section 11135(c)(1), full and equal access to the services, programs, and activities offered by Defendant in violation of Section 11135.

99.     As a direct and proximate result of RCHSD's violation of California Government Code Section 11135, Kyler and Katharine have been injured as set forth herein.

100.   Plaintiffs seek relief, including declaratory and injunctive relief, as set forth below.

## SIXTH CAUSE OF ACTION

### VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE

### § 17200 *et seq*.

101.   Plaintiffs incorporate by reference each and every allegation in the foregoing paragraphs of this Complaint.

102.   California Business & Professions Code Section 17200, also known as the

COMPLAINT

California Unfair Competition Law, prohibits unfair competition in the form of any unlawful, unfair, or fraudulent business act or practice.

103.  California Business & Professions Code Section 17204 allows "any person acting for the interests of itself, its members, or the general public" to prosecute a civil action for violation of the Unfair Competition Law.

104.  As set forth herein, RCHSD committed unlawful, unfair, and/or fraudulent business acts and practices as defined by California Business & Professions Code Section 17200, by engaging in the following acts, without limitation:

a.  Unfairly and falsely representing itself to Katharine, Kyler, and to the general public as being capable of working with transgender patients and patients with gender dysphoria in violation of Cal. Bus. & Prof. Code Section 17500. Defendant made these representations through the operation of its Gender Management Clinic, through statements and information contained on its website and in statements to Katharine prior to and during Kyler's stay at RCHSD.

b.  Failing to respect the rights of patients pursuant to the Lanterman-Petris Short Act, which clarifies the rights of people with mental health conditions and provides safeguards to ensure that treatment procedures are appropriate.  Cal. Welf. & Inst. Code § 5325.  These rights require that "[t]reatment should be provided in ways that are least restrictive of the personal liberty of the individual," and provide a "right to dignity, privacy, and human care," and a "right to be free from unnecessary or excessive . . . isolation, or abuse."  Cal. Welf. & Inst. Code § 5325.1.

c.  Failing to provide public accommodations free from discrimination based on gender identity, as required by the Unruh Civil Rights Act, California Government Code section 11135, and the Affordable Care Act.

d.  Failing to provide public accommodations free from discrimination based on disability, as required by the Unruh Civil Rights Act, and California Government Code § 11135.

COMPLAINT

105.   Katharine would not have sought medical care for Kyler at RCHSD had she known that RCHSD's claims were false.

106.   The unfair acts describe above and the violations of law serve as unlawful, unfair, and/or fraudulent predicate acts and practices for purposes of California Business & Professions Code Section 17200.  As a direct and proximate result of RCHSD's unfair acts and practices described herein, Katharine and Kyler have suffered economic injury, including but not limited to the loss of money and/or property, such as medical and hospital costs, counseling fees, travel expenses, and other out-of-pocket expenses.

107.   Katharine and Kyler have also suffered injury in fact as a result of RCHSD's actions for which there is no adequate remedy at law.  Plaintiffs are informed and believe and thereon allege that unless restrained by order of this Court, RCHSD will continue the acts alleged above, or similar acts.

108.   By all of the foregoing alleged conduct, RCHSD has committed, and is continuing to commit, ongoing unlawful, unfair, and/or fraudulent business practices within the meaning of California Business & Professions Code Section 17200 *et seq.*

109.   As a direct and proximate result of the unfair business practices described above, Plaintiffs have suffered significant losses, and Defendant has been unjustly enriched.

110.   Pursuant to California Business & Professions Code Section 17203, Plaintiffs are entitled to (a) restitution of money acquired by means of its unfair business practices, in amounts not yet ascertained but to be ascertained at trial; (b) injunctive relief against Defendant's continuation of its unfair business practices; and (c) a declaration that Defendant's business practices are unfair within the meaning of the statute.

111.   Plaintiffs have assumed the responsibility of enforcement of the laws and lawful claims specified herein.  There is a financial burden incurred in pursuing this action which is in the public interest.  Therefore, reasonable attorneys' fees are appropriate pursuant to California Code of Civil Procedure Section 1021.5.

COMPLAINT

## SEVENTH CAUSE OF ACTION

## VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE

### § 17500 *et seq.*

112.   Plaintiffs incorporate by reference each and every allegation in the foregoing paragraphs of this Complaint.

113.   RCHSD has engaged in false advertising by the following acts, without limitation:

      a.     Stating on its website that children with gender dysphoria "deserve to have a medical home at Rady Children's Hospital–San Diego."

      b.     Representing to Katharine and Kyler that Kyler's sex would be respected; in other words, he would be referred to with masculine pronouns and would be otherwise treated as a male patient in all respects.

114.   Katharine would not have sought medical care for Kyler at RCHSD had she known that RCHSD's claims were false.

115.   Plaintiffs are informed and believe, and thereupon allege, that RCHSD intended to sell services by engaging in advertising that was untrue or misleading, and which RCHSD knew or should have known was untrue or misleading, concerning its ability to provide services to transgender patients.

116.   As a direct and proximate result of RCHSD's unfair acts and practices described herein, Katharine and Kyler have suffered economic injury, including but not limited to the loss of money and/or property, such as medical and hospital costs, counseling fees, travel expenses, and other out-of-pocket expenses.

117.   RCHSD's false advertising is ongoing and presents a threat to members of the general public seeking appropriate medical treatment options in that RCHSD has failed to publicly acknowledge the wrongfulness of its actions, implement institutional changes to prevent problems from recurring, and otherwise provide the complete relief required by statute.

118.   RCHSD's acts and practices as alleged herein constitute acts of false

COMPLAINT

advertising within the meaning of California Business & Professions Code Section 17500 *et seq.*

119. Plaintiffs are entitled to restitution of all monies paid to RCHSD as a result of Defendant's false advertising and to injunctive relief under California Business & Professions Code Section 17535 to prevent continued false advertising by Defendant.

120. Plaintiffs seek relief, including declaratory and injunctive relief, as set forth below.

**PRAYER**

**WHEREFORE**, Plaintiffs pray for judgment as follows:

1. Compensatory damages and restitution in an amount to be determined at trial, plus interest accruing between April 5, 2015, and the date of judgment;

2. For injunctive relief, according to proof;

3. For punitive damages according to proof, but not less than $4,000;

4. For attorney fees, statutory costs, and expenses;

5. For judgment in favor of Plaintiffs and against each Defendant on all causes of action; and

6. For such other and further relief as the Court may deem just and proper.

COMPLAINT

## DEMAND FOR JURY TRIAL

Plaintiff Katharine Prescott, an individual, and on behalf of Kyler Prescott, a deceased minor, hereby demands a jury trial.

DATED:  September 26, 2016          **FOLEY & LARDNER LLP**
Eileen R. Ridley
Alan R. Ouellette
Kathryn A. Shoemaker


/s/ Eileen R. Ridley
Eileen R. Ridley
Attorneys for Plaintiffs KATHARINE PRESCOTT, an individual, and KATHARINE PRESCOTT, on behalf of KYLER PRESCOTT, a deceased minor

COMPLAINT